[No. C016756. Third Dist. May 25, 1994.]

SAN MIGUEL CONSOLIDATED FIRE PROTECTION DISTRICT et al., Plaintiffs and Appellants, v.
GRAY DAVIS, as State Controller, etc., et al., Defendants and Respondents;
HARRY WEINBERG, as Superintendent, etc., et al., Real Parties in Interest.

## COUNSEL

Ross & Scott, William D. Ross, and Carol B. Sherman for Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, Allen Sumner, Assistant Attorney General, Linda Cabatic, Deputy Attorney General, Thomas H. Gordinier, County Counsel (Solano), Vicki Sieber-Benson, Assistant County Counsel, L. B. Elam, County Counsel (Sacramento) , John F. Whisenhunt, Deputy County Counsel, Dwight L. Herr, County Counsel (Santa Cruz), Samuel Torres, Jr., Assistant County Counsel, Lloyd M. Harmon, Jr., County Counsel (San Diego), Diane Bardsley, Chief Deputy County Counsel,. Ian Fan and

Theresa Osterman Stevenson, Deputy County Counsel, for Defendants and Respondents.

Christian M. Keiner and J. Stanton Bair for Real Parties in Interest.

## OPINION

NICHOLSON, J.—This appeal challenges the constitutionality of Revenue and Taxation Code[1] section 97.03, subdivision (c), which reallocates a percentage of property tax revenues from special districts to each county's Educational Revenue Augmentation Fund.[2] Eight fire protection districts, a municipal improvement water district which provides fire protection services based on a contract with a neighboring city, and nine individual taxpayers from Sacramento, San Diego, Solano, and Santa Cruz Counties, filed a petition for writ of mandate and complaint for declaratory relief against the State Controller, the State Director of Finance, and the county auditor-controllers for the four respective counties, challenging both the statute's constitutionality and respondents' computations pursuant to the statute.[3] The trial court denied the petition and entered judgment for respondents on the complaint. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

The Legislature enacted section 97.03 in 1992. Pursuant to subdivision (c) of this section, for fiscal year 1992-1993,[4] each county was required to reduce the amount of property tax revenue allocated to each special district in the prior fiscal year by 35 percent, and deposit these nonallocated funds in the county's Educational Revenue Augmentation Fund.[5] (§ 97.03, subds. (c)(1), (d)(1).)

---

[1]All further undesignated statutory references are to the Revenue and Taxation Code.

[2]The fund, in turn, allocates these revenues to school districts, county offices of education, and community college districts. (§ 97.03, subd. (d)(1).)

[3]The petitioners in this action are San Miguel Consolidated Fire Protection District, Rural Fire Protection District, North County/Rainbow Fire Protection District, Rincon del Diablo Municipal Water District-Improvement District "E," Vacaville Fire Protection District, Sacramento County Fire Protection District, Aptos/La Selva Fire Protection District, Central Fire Protection District, Scotts Valley Fire Protection District, Emilio Romero, Gordon A. Hammers, Fred E. Buck, Jack Hinrichs, Robert L. Shaw, Sr., Dean O. O'Brien, Stephen D. Mills, Robert L. Allen, and Burt Bly. The named respondents are Gray Davis, Controller of the State of California; Robert Booker, Auditor-Controller of the County of San Diego; William Ricciardi, Auditor-Controller of the County of Solano; Nancy E. Wolford, Auditor-Controller of the County of Sacramento; Thomas Hayes, State Director of Finance; and Gary A. Knutsen, Auditor-Controller of the County of Santa Cruz.

[4]The computations and calculations for fiscal year 1993-1994 are set forth in section 97.035.

[5]In October 1993, after the entry of judgment in this matter, the Legislature amended section 97.03 to provide additional exclusions from the determination of a special district's

In the trial court, petitioners argued section 97.03, subdivision (c), denied them due process and equal protection, was unconstitutionally vague, violated article XIII A of the California Constitution, and impaired their

---

total annual revenues. Section 97.03, subdivision (c) now provides, in pertinent part (the 1993 amendments are italicized): "(1) Subject to paragraph (2), the amount of property tax revenue, other than those revenues that are pledged to debt service, deemed allocated in the prior fiscal year to a special district, other than a multicounty district, a local hospital district, or a district governed by a city council or whose governing board has the same membership as a city council, shall be reduced by 35 percent. For purposes of this subdivision, 'revenues that are pledged to debt service' include only those amounts required to pay debt service costs in the 1991-92 fiscal year on debt instruments issued by a special district for the acquisition of capital assets. [¶] (2) No reduction pursuant to paragraph (1) for any special district, other than a countywide water agency that does not sell water at retail, shall exceed an amount equal to 10 percent of that district's total annual revenues, from whatever source, as shown in the 1989-90 edition of the State Controller's Report on Financial Transactions Concerning Special Districts (*not including any annual revenues from fiscal years following the 1989-90 fiscal year*). With respect to any special district, as defined pursuant to subdivision (m) of Section 95, that is allocated property tax revenue pursuant to this chapter but does not appear in the State Controller's Report on Financial Transactions Concerning Special Districts, the auditor shall determine the total annual revenues for that special district from the information in the 1989-90 edition of the State Controller's Report on Financial Transactions Concerning Counties. With respect to a special district that did not exist in the 1989-90 fiscal year, the auditor may use information from the first full fiscal year, as appropriate, to determine the total annual revenues for that special district. No reduction pursuant to paragraph (1) for any countywide water agency that does not sell water at retail shall exceed an amount equal to 10 percent of that portion of that agency's general fund derived from property tax revenues. [¶] (3) The auditor in each county shall, on or before January 15, 1993, and on or before January 30 *of* each year thereafter, submit information to the Controller concerning the amount of the property tax revenue reduction to each special district within that county as a result of paragraphs (1) and (2). The Controller shall certify that the calculation of the property tax revenue reduction to each special district within that county is accurate and correct, and submit this information to the Director of Finance. [¶] . . . *(4) For the purpose of determining the total annual revenues of a special district, all of the following shall be excluded from the determination of total annual revenues: [¶] (A) Any one-time revenues received by the district from any source, public or private. [¶] (B) Any revenues derived from an enterprise activity with respect to which no property tax revenues are reported on the district's most recent report to the Controller of financial transactions. For purposes of computing this exclusion with respect to a special district created by consolidation of two or more special districts subsequent to the 1989-1990 fiscal year, the amount of the exclusion shall be the aggregate of the exclusions that would have been applicable under this subparagraph as if each former district so consolidated had continued in existence.* [¶] (5) For the purpose of determining the total annual revenues of a special district that provides fire protection or fire suppression services, all of the following shall be excluded from the determination of total annual revenues: [¶] (A) If the district had less than two million dollars ($2,000,000) in total annual revenues in the 1991-92 fiscal year, the revenue generated by a fire suppression assessment levied pursuant to Article 3.6 (commencing with Section 50078) of Chapter 1 of Part 1 of Division 1 of Title 5 of the Government Code. [¶] (B) Any appropriation for fire protection received by a district pursuant to Section 25642 of the Government Code. [¶] (C) The revenue received by a district as a result of contracts entered into pursuant to Section 4133 of the Public Resources Code. . . ."

contract rights to property tax revenues. Petitioners further argued any computations pursuant to this section should exclude from the definition of "revenue" certain types of funds, such as mitigation fees, reimbursements, refunds, interest, and cost recoveries, and contended they were entitled to offset any shifting of property tax revenues by the amount of any reimbursement owed to the county by the state. The trial court rejected each of these contentions, denying the petition for writ of mandate and entering judgment for respondents on the complaint for declaratory relief.

DISCUSSION

I

*Standing*

■ Preliminarily, respondents assert the eight fire protection districts and the municipal improvement water district, as political subdivisions of the state, have no standing to raise constitutional challenges to actions taken by another agency pursuant to state legislation. Even if respondents are correct, the petitioning individual taxpayers are private parties who clearly can maintain this suit.

■ "[P]olitical subdivision[s] of state government[ ] exercis[e] only the powers of the state, granted by the state, created for the purpose of advancing 'the policy of the state at large . . . .' " (*County of Marin* v. *Superior Court* (1960) 53 Cal.2d 633, 638-639 [2 Cal.Rptr. 758, 349 P.2d 526].) ■ Respondents correctly note special districts have no "vested right" to receive property tax revenues (*Marin Hospital Dist.* v. *Rothman* (1983) 139 Cal.App.3d 495, 501 [188 Cal.Rptr. 828]) and no "property interest" in such revenues (*Board of Supervisors* v. *McMahon* (1990) 219 Cal.App.3d 286, 297 [268 Cal.Rptr. 219]), because "*as against the state*, the county [or district] has no ultimate interest in the property under its care." (*County of Marin* v. *Superior Court, supra*, 53 Cal.2d at p. 639, italics in original; see also *Conlin* v. *Board of Supervisors* (1893) 99 Cal. 17, 21 [33 P. 753] [local moneys are public moneys acquired under the authority of the state for public purposes; Legislature thus may direct a local government to make any payment of its funds].) ■ "[*A*]*ll* property under the care and control of a county is merely held in trust by the county for the people of the entire state. . . . The county holds all its property . . . as agent of the state. [Citations.]" (*County of Marin* v. *Superior Court, supra*, 53 Cal.2d at pp. 638-639, italics in original.)

■ The districts offer three arguments in their attempt to establish their standing to bring this lawsuit. They first contend these legal principles do

not preclude them from seeking a declaratory judgment regarding the legality of section 97.03, citing *City of Carmel-by-the-Sea* v. *Young* (1970) 2 Cal.3d 259 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313]. *Carmel* involved a constitutional attack on a 1969 financial disclosure statute, which the California Supreme Court found "undert[ook] an overbroad intrusion into the right of privacy and thereby invalidly restrict[ed] the right to seek or hold public office or employment." (*Id.* at p. 262.) The districts cite a sentence from *Carmel* which states: "The declaratory relief here sought by the city on the ground of unconstitutionality of the statute is a proper remedy." (*Id.* at p. 263.) However, the authority for this proposition merely holds either an injunction or declaratory relief is a "proper method of determining the constitutionality of [a] challenged ordinance." (*Abbott* v. *City of Los Angeles* (1960) 53 Cal.2d 674, 678, fn. 2 [3 Cal.Rptr. 158, 349 P.2d 974, 82 A.L.R.2d 385].) Nowhere within the *Carmel* opinion does the court address standing. Thus, we find the case inapposite.

Second, the districts contend they may assert an equal protection argument pursuant to the California, rather than the federal, Constitution. However, we previously have rejected this very contention. (*Board of Supervisors* v. *McMahon, supra*, 219 Cal.App.3d at pp. 296-297.)

Finally, the districts assert they have standing "to assert the rights of [their] residents and property taxpayers to equal protection and due process," citing *Selinger* v. *City Council* (1989) 216 Cal.App.3d 259 [264 Cal.Rptr. 499]. *Selinger* involved a city's challenge to the Permit Streamlining Act as "fail[ing] to safeguard the constitutional rights of adjacent landowners to notice and a hearing before they are deprived of substantial property rights." (*Id.* at p. 270.) The court held the city council had standing to assert the rights of local citizens because "[l]ocal citizens' rights are inextricably bound up with the City's duty to review and condition subdivision approvals to assure appropriate land uses and prevent overburdening of local services. [¶] More important, however, are the 'genuine obstacles' to local citizens' ability to raise their own rights. All legal challenges to decisions approving tentative maps must be brought within 90 days or they will be barred by the statute of limitations . . . . Without prior notice, affected property owners are unable to learn until after the fact that their rights have been jeopardized." (*Id.* at p. 271.)

Petitioners argue "residents' and taxpayers' rights to due process and equal protection in the distribution of property tax revenues are 'inextricably bound up with the activity the [Districts] wish to pursue' (e.g., compliance with their duty to provide fire prevention, suppression and emergency

services)." The due process interests implicated in *Selinger* due to "the City's duty to review and condition subdivision approvals" have no analogy here because the petitioning districts do not implement the statute in question. Thus, the special districts have no standing to bring this action.

█ Nevertheless, the action may proceed because standing is accorded the petitioning individual taxpayers. The trial court permitted amendment of the pleadings to add nine petitioners who are individual taxpayers. Respondents contend these individual taxpayers also lack standing because the individual taxpayers "stand in the shoes" of the districts. We disagree.

"Taxpayer suits are well recognized in California jurisprudence and are explicitly authorized by statute. (Code Civ. Proc., § 526a.[6]) Among other things, section 526a has been interpreted as authorizing a taxpayer to contest the legality of a taxing statute." (*County of Sonoma* v. *State Bd. of Equalization* (1987) 195 Cal.App.3d 982, 989 [241 Cal.Rptr. 215].)

Citing *Sundance* v. *Municipal Court* (1986) 42 Cal.3d 1101 [232 Cal.Rptr. 814, 729 P.2d 80], and *Los Altos Property Owners Assn.* v. *Hutcheon* (1977) 69 Cal.App.3d 22 [137 Cal.Rptr. 775], respondents argue the allocation of property tax revenues is a political determination, and petitioners' challenge amounts to a "mere difference in judgment as to how public funds should be spent." (Italics omitted.) Although these challenges may be motivated in part by politics, the constitutional arguments posed by the individual taxpayers are properly before us. Petitioners seek to "measure governmental performance against a legal standard" which does not require us to "trespass into the domain of legislative . . . discretion." (*Harman* v. *City and County of San Francisco* (1972) 7 Cal.3d 150, 160-161 [101 Cal.Rptr. 880, 496 P.2d 1248].) We shall address the issues raised.[7]

## II

### *Vagueness*

█ Turning to the merits, petitioners contend section 97.03, subdivision (c) is unconstitutionally vague, and therefore its application "constitutes

---

[6]Pursuant to Code of Civil Procedure section 526a, an individual taxpayer may bring "[a]n action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the State . . . ."

[7]Respondents also assert the concerns of the individual petitioners are premature because any claim of individual harm is speculative. In *Amador Valley Joint High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208 [149 Cal.Rptr. 239, 583 P.2d 1281], the Supreme Court entertained a constitutional challenge despite a ripeness objection because "assessors throughout the state must be advised whether to follow the new assessment procedure." (*Id.* at p. 233.) Similarly, we shall review petitioners' constitutional challenges to section 97.03.

a denial of constitutional due process based on a lack of definitional terms." Petitioners challenge two terms: "property tax revenue" and "total annual revenues."

Statutory interpretation is a question of law, which we review de novo. (*Burden* v. *Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].) When statutory language is clear and unambiguous, there is no need for construction and we shall not indulge in it. (*Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 73 [276 Cal.Rptr. 130, 801 P.2d 373]; *Squaw Valley Ski Corp.* v. *Superior Court* (1992) 2 Cal.App.4th 1499, 1512 [3 Cal.Rptr.2d 897].)

For the sake of clarity, we set forth the pertinent portions of section 97.03, underscore the 1993 amendment to this section, and italicize the terms petitioners assert are ambiguous: "(c)(1) Subject to paragraph (2), the amount of *property tax revenue*, other than those revenues that are pledged to debt service, deemed allocated in the prior fiscal year to a special district . . . shall be reduced by 35 percent. For purposes of this subdivision, 'revenues that are pledged to debt service' include only those amounts required to pay debt service costs in the 1991-92 fiscal year on debt instruments issued by a special district for the acquisition of capital assets. [¶] (2) No reduction pursuant to paragraph (1) for any special district . . . shall exceed an amount equal to 10 percent of that district's total *annual revenues*, from whatever source, as shown in the 1989-90 edition of the State Controller's Report on Financial Transactions Concerning Special Districts (not including any annual revenues from fiscal years following the 1989-90 fiscal year)."

■ "[T]he due process doctrine of vagueness . . . incorporates notions of fair notice or warning. . . . [¶] . . . '[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" (*Smith* v. *Goguen* (1974) 415 U.S. 566, 572-573 and fn. 8 [39 L.Ed.2d 605, 611-612, 94 S.Ct. 1242].) "All presumptions and intendments favor the validity of a statute. [Citation.] Statutes must be upheld unless their unconstitutionality clearly, positively and unmistakably appears." (*Eden* v. *Van Tine* (1978) 83 Cal.App.3d 879, 886 [148 Cal.Rptr. 215, 12 A.L.R.4th 856].)

"The requirement for certainty is not intended to demand that statutes be subject to absolute 'yes-no' or 'on-off' precision. Reasonable certainty is all that is required [citation]. 'It is not required that a statute, to be valid, have that degree of exactness which inheres in a mathematical theorem. It is not

necessary that a statute furnish detailed plans and specifications of the acts or conduct prohibited. The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding.' [Citation.]" (*Gutknecht v. City of Sausalito* (1974) 43 Cal.App.3d 269, 274 [117 Cal.Rptr. 782].)

As used in this statute, "property tax revenue" is not ambiguous. "Property tax revenue" is revenue generated by property taxes. Section 95, which provides definitions "[f]or the purpose of this chapter," lists "property tax revenues" within its definitions, but rather than define "property tax revenues" itself, the section merely sets forth inclusions to, and exclusions from, "property tax revenue."[8] (§ 95, subd. (c).) The lack of a formal definition for a commonly understood term does not render a statute void for vagueness. (See *People v. Rodriguez* (1975) 50 Cal.App.3d 389, 398-399 [123 Cal.Rptr. 185] [requisite certainty may be supplied by reference to plain commonsense meaning of terms].)

Petitioners' argument with respect to "total annual revenues" is even less persuasive. By its terms, section 97.03, subdivision (c) provides a definitional explanation: "No reduction pursuant to paragraph (1) for any special district, . . . shall exceed an amount equal to 10 percent of that district's *total annual revenues, from whatever source, as shown in the 1989-90 edition of the State Controller's Report on Financial Transactions Concerning Special Districts* . . . ." (Italics added.) Moreover, former subdivision (c)(4) (now subd. (c)(5))[9] and section 97.06[10] set forth express exclusions from the determination of total annual revenues for "special district[s] that provide[ ]

---

[8]Section 95, subdivision (c) provides: " 'Property tax revenue' includes the amount of state reimbursement for the homeowners' exemption. [¶] 'Property tax revenue' does not include the amount of property tax levied for the purpose of making payments for the interest and principal on (1) general obligation bonds or other indebtedness approved by the voters prior to July 1, 1978, including tax rates levied pursuant to Part 10 (commencing with Section 15000) of Division 1 of, and Sections 39308 and 39311 and former Sections 81338 and 81341 of the Education Code, and Section 26912.7 of the Government Code, and (2) bonded indebtedness for the acquisition or improvement of real property approved by two-thirds of the voters on or after June 4, 1986."

[9]See footnote 5, *ante.*

[10]Section 97.06 provides: "For the purpose of determining under Section 97.03 the total annual revenues of a special district that provides fire protection or fire suppression services and had less than two million dollars ($2,000,000) in total annual revenues in the 1991-92 fiscal year, all of the following shall, in addition to any other revenues otherwise excluded, be excluded from the determination of total annual revenues: [¶] (a) The revenue generated by a special tax levied pursuant to Article 3.5 (commencing with Section 50075) of Chapter 1 of Part 1 of Division 1 of Title 5 of the Government Code. [¶] (b) The revenue generated by a special tax levied pursuant to Chapter 2.5 (commencing with Section 53311) of Part 1 of Division 2 of Title 5 of the Government Code. [¶] (c) The revenue generated by a special tax

fire protection or fire suppression services," and the Legislature created additional exclusions from total annual revenues when it amended section 97.03 in October 1993. (See § 97.03, subd. (c)(5).) "Total annual revenues" is defined with reasonable certainty.[11]

We find section 97.03, subdivision (c) neither unconstitutionally vague nor uncertain.

### III

*California Constitution, Article XIII A*

■ Petitioners argue the reallocation of property tax revenue authorized by section 97.03, subdivision (c), violates article XIII A of the California Constitution, known as "Proposition 13." Petitioners' argument is based upon language from the ballot pamphlet summaries analyzing article XIII A, which stated its 1 percent limitation on property tax revenue would preserve revenue "far above the level required to pay for property-related governmental services" such as fire protection, and would not require a reduction in "vital services like [*sic*] police or fire." (Italics omitted.)

The California voters adopted California Constitution, article XIII A by initiative more than 15 years ago. Article XIII A, section 1, subdivision (a) states: "The maximum amount of any ad valorem tax on real property shall not exceed One percent (1%) of the full cash value of such property. The one percent (1%) tax to [*sic*] be collected by the counties and apportioned according to law to the districts within the counties." Thus, article XIII A expressly vests the Legislature with the authority to apportion property tax revenue. Article XIII A contains no limitation upon the Legislature's authority to apportion these revenues, and accordingly, this article does not prohibit reductions in revenues to fire protection or fire suppression districts.

" 'If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. *Such restrictions and limitations [imposed by the Constitution] are to be construed*

---

levied pursuant to Article 16 (commencing with Section 53970) of Chapter 4 of Part 1 of Division 2 of Title 5 of the Government Code."

[11]As noted by the trial court: "I have never seen a statute quite so precise as to incorporate by reference a document [the State Controller's report] which lists a variety of forms of income, ending with the catch-all 'all other forms of revenue.' And so it seems to me clearly that the Legislature knew precisely what it was doing in this case, wanted to obviate the very kind of dispute we're having by saying, look, for this purpose only, this calculation purpose, we want to be all-inclusive. And that is exactly what they were. How more all-inclusive could you get than 'all other'?"

*strictly, and are not to be extended to include matters not covered by the language used.'* " (*California Teachers Assn.* v. *Hayes* (1992) 5 Cal.App.4th 1513, 1532 [7 Cal.Rptr.2d 699], italics in original.) Absent some ambiguity requiring extrinsic aid in interpreting a constitutional provision, we do not refer to such outside materials as voter pamphlets. (*Delaney* v. *Superior Court* (1990) 50 Cal.3d 785, 798 [268 Cal.Rptr. 753, 789 P.2d 934]; *In re Lance W.* (1985) 37 Cal.3d 873, 886 [210 Cal.Rptr. 631, 694 P.2d 744]; accord, *Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1 [26 Cal.Rptr.2d 834, 865 P.2d 633].) Petitioners have not argued an ambiguity exists within article XIII A, and the California Supreme Court has noted ambiguities in article XIII A were eliminated by subsequent legislation. (*Amador Valley Joint High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at pp. 246-247.) Accordingly, because the constitutional provision is clear and unambiguous, it is unnecessary to resort to indicia of the voters' intent. (*California Auto. Assigned Risk Plan* v. *Garamendi* (1991) 234 Cal.App.3d 1486, 1490 [286 Cal.Rptr. 257].)

California Constitution, article XIII A expressly authorizes the Legislature to apportion property tax revenues and does not conflict with section 97.03.[12]

## IV

### *Equal Protection*

■ Petitioners assert sections 97.03 and 97.06, by exempting special assessments and special taxes levied by small fire districts[13] from the calculation of total annual revenues, deny equal protection by failing to provide similar exemptions to other fire districts.

■ " 'In the area of economic regulation, the [state and federal high courts have] exercised restraint, investing legislation with a presumption of constitutionality and requiring merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose.' " (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 597 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187].) "[I]n taxation, even more than in other fields, legislatures possess the greatest freedom in classification. Since the members of a legislature necessarily enjoy a familiarity with local conditions . . . , the presumption of constitutionality can be overcome only

---

[12]It is not the province of the judiciary to second-guess the wisdom of legislative appropriations. The forums for addressing this issue lie with the voters and the Legislature.

[13]The exemptions in sections 97.03 and 97.06 apply to special districts providing fire protection or fire suppression services with less than $2 million in total annual revenues in the 1991-1992 fiscal year. (§§ 97.03, subd. (c)(5)(A), 97.06.)

by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes. The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." (*Madden* v. *Kentucky* (1940) 309 U.S. 83, 88 [84 L.Ed. 590, 593, 60 S.Ct. 406, 125 A.L.R. 1383], fn. omitted.)

The Legislature has " 'especially broad latitude in creating classifications and distinctions in tax statutes.' " (*Nordlinger* v. *Hahn* (1992) 505 U.S. __ [120 L.Ed.2d 1, 13, 112 S.Ct. 2326].) " 'The latitude of discretion is notably wide in the . . . granting of partial or total exemptions upon grounds of policy.' [Citations.] There exists no 'iron rule of equality, prohibiting the flexibility and variety that are appropriate' to schemes of taxation. [Citations.] So long as a system of taxation is supported by a rational basis, and is not palpably arbitrary, it will be upheld despite the absence of ' "a precise, scientific uniformity" ' of taxation." (*Amador Valley Joint High Sch. Dist.* v. *State Bd. of Equalization, supra*, 22 Cal.3d at p. 234, italics omitted.)

■ In granting small fire districts this additional exemption, the Legislature noted: "In order to protect the funding base of the state's small fire districts and thereby permit those special districts to continue to adequately protect both life and property, it is necessary for this act to take effect immediately." (Stats. 1992, ch. 1371, § 2.) A rational basis thus underlies the additional exemption for small fire districts and the distinction is not "palpably arbitrary." We find no denial of equal protection.

## V

### *Impairment of Contract*

■ Petitioners argue section 97.03, subdivision (c), as applied, impairs contract rights between Rincon del Diablo Municipal Water District-Improvement District "E" (Rincon) and the City of Escondido, whereby fire protection services were provided to the district.

Even aside from whether a general reduction in revenues may be held to impair a specific contract, this argument is prematurely raised. Although "the ultimate operation of the [statute] may result in a . . . reduction in the amount of available revenues, . . . as yet no direct impairment of any contract . . . has occurred by virtue thereof." (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra*, 22 Cal.3d at p. 239.) Petitioners allege "the City of Escondido has indicated that the fire contract *will be impaired*, or terminated, if the District property tax revenues are reduced in the amount of $72,000 as that would constitute a substantial

reduction in the amount of compensation due the City of Escondido for providing fire services . . . ." (Italics added.) We find petitioners' challenge to section 97.03 on the ground of impairment of contract premature.

VI

*Collateral Estoppel*

Petitioners next set forth a collateral estoppel argument, contending because property tax revenues had previously been allocated to eight of the nine petitioning special districts by local agency formation commissions (LAFCO) pursuant to the Cortese-Knox Local Government Reorganization Act of 1985[14] (Act), this previous allocation precludes further reallocation of property tax revenues pursuant to section 97.03.

The Act notes "a single governmental agency, rather than several limited purpose agencies, is in many cases better able to assess and be accountable for community service needs and financial resources and, therefore, is the best mechanism for establishing community service priorities." (Gov. Code, § 56001.) Among the purposes of LAFCO "are the discouragement of urban sprawl and the encouragement of the orderly formation and development of local agencies based upon local conditions and circumstances." (Gov. Code, § 56301.) Toward this end, LAFCO has the power to "review and approve or disapprove . . . proposals for changes of organization or reorganization" of cities and districts. (Gov. Code, § 56375, subd. (a).) When a special district is created or reorganized and assumes functions previously performed by another local agency, the Legislature has instructed LAFCO to determine "the property tax revenue to be exchanged by the affected local agencies . . . ." (Gov. Code, §§ 56375, subd. (q), 56842, subds. (c) and (d).) The county auditor-controller then correspondingly adjusts the property tax revenue distribution. (§ 99, subd. (a)(3).) Petitioners argue this exchange of property tax revenue is a "quasi-judicial" decision collaterally estopping respondents from subsequently reallocating property tax revenues from the special districts to schools.

Administrative collateral estoppel precludes relitigation of an issue decided in a prior proceeding where "(1) the administrative agency acted in

---

[14]Government Code section 56000 et seq. The predecessors to this Act, Government Code former section 54773 et seq. (the Knox-Nisbet Act) and sections 35000-35500 (the Municipal Organization Act), provided similar powers to local agency formation commissions. (See *City of Ceres* v. *City of Modesto* (1969) 274 Cal.App.2d 545, 549-553 [79 Cal.Rptr. 168]; see also *City of Highland* v. *County of San Bernardino* (1992) 4 Cal.App.4th 1174, 1180, fn. 2 [6 Cal.Rptr.2d 346].)

a judicial capacity; (2) it resolved disputed issues properly before it; and (3) all parties were provided with the opportunity to fully and fairly litigate their claims." (*Carmel Valley Fire Protection Dist.* v. *State of California* (1987) 190 Cal.App.3d 521, 535 [234 Cal.Rptr. 795].) LAFCO determinations do not satisfy these prerequisites.

LAFCO is "a creature of the Legislature and has only those express (or necessarily implied) powers which are specifically granted to it by statute. In short, LAFCO is a public entity created by legislative fiat, and like similarly constituted public entities is a body of special and limited jurisdiction [citation]." (*City of Ceres* v. *City of Modesto, supra,* 274 Cal.App.2d at p. 550.) LAFCO is a "quasi-legislative administrative agency" (*Horwath* v. *Local Agency Formation Com.* (1983) 143 Cal.App.3d 177, 182 [191 Cal.Rptr. 593]) whose proceedings are "quasi-legislative in nature." (*City of Santa Cruz* v. *Local Agency Formation Com.* (1978) 76 Cal.App.3d 381, 387 [142 Cal.Rptr. 873], italics omitted; see also *City of Highland* v. *County of San Bernardino, supra,* 4 Cal.App.4th at pp. 1193-1194.) "[T]he nature of the power exercised is legislative and political rather than judicial . . . ." (*Bookout* v. *Local Agency Formation Com.* (1975) 49 Cal.App.3d 383, 387 [122 Cal.Rptr. 668].) Moreover, unlike quasi-judicial proceedings, LAFCO decisions are reviewed by ordinary mandamus rather than administrative mandamus. (*City of Santa Clara* v. *Local Agency Formation Com.* (1983) 139 Cal.App.3d 923, 927, fn. 3 [189 Cal.Rptr. 112].) Accordingly, since LAFCO did not act in a judicial capacity, collateral estoppel has no applicability to its determinations.[15]

Moreover, LAFCO determinations do not constitute a prior adjudication of the same issue. The reorganization of a special district involves an exchange of property tax revenue due to a change in the responsibility for the delivery of services. This is a very different matter from a *subsequent* reallocation of a flat percentage of property tax revenues from special districts to schools. Reorganization of the districts occurred between 1983 and 1989, well before passage of section 97.03. The issue of section 97.03 reallocations could not have been raised during the LAFCO proceedings, nor does LAFCO have authority to consider the effects of section 97.03 in any

[15]Petitioners cite *Carmel Valley Fire Protection Dist.* v. *State of California, supra,* in support of their collateral estoppel contention. However, *Carmel Valley* involved a determination by the State Board of Control upon a claim for reimbursement. The court noted the Board of Control "was created by the state Legislature to exercise quasi-judicial powers in adjudging the validity of claims against the State," including the power to administer oaths and issue subpoenas. (190 Cal.App.3d at p. 535.) When the state did not challenge the board's findings in a timely manner, the court held the state was collaterally estopped from relitigating the board's determination. We do not find the circumstances of *Carmel Valley* analogous to the LAFCO determination here.

event. There is simply no basis for invoking the doctrine of collateral estoppel.

## VII

### *In Pari Materia*

██ Petitioners assert section 97.03 must be read in pari materia with Government Code section 56842, which governs the reallocation of property tax revenues in a LAFCO reorganization proceeding.[16] Thus, according to petitioners, the exclusions set forth in Government Code section 56842 must also be applied to section 97.03 calculations of total annual revenues.

Petitioners argue these two statutes must be read in pari materia because both relate to the apportionment of property tax revenues to reorganized special districts, both were amended by the same chaptered legislation,[17] and the failure to do so would violate the single subject rule.[18] We are not persuaded.

---

[16]Government Code section 56842 provides, in pertinent part: "(a) . . . [¶] (2) If the proposal includes the formation of a district, as defined in Section 2215 of the Revenue and Taxation Code, the commission shall determine the amount of property tax to be exchanged by the affected local agency pursuant to this section. . . . [¶] (c) If the proposal would not transfer all of an affected agency's service responsibilities to the proposed city or district, the commission and the county auditor shall do all of the following: [¶] (1) The county auditor shall determine the proportion that the amount of property tax revenue derived by each affected local agency pursuant to subdivision (b) of Section 93 of the Revenue and Taxation Code bears to the total amount of revenue from all sources, available for general purposes, received by each affected local agency in the prior fiscal year. For purposes of making this determination and the determination required by paragraph (3), 'total amount of revenue from all sources available for general purposes' means the total amount of revenue which an affected local agency may use on a discretionary basis for any purpose and does not include any of the following: [¶] (A) Revenue which, by statute, is required to be used for a specific purpose. [¶] (B) Revenue from fees, charges, or assessments which are levied to specifically offset the cost of particular services and do not exceed the cost reasonably borne in providing these services. [¶] (C) Revenue received from the federal government which is required to be used for a specific purpose."

[17]The Legislature amended both statutes in Assembly Bill No. 3027. (Stats. 1992, ch. 1369, §§ 2, 10.)

[18]Article IV, section 9 of the California Constitution provides: "A statute shall embrace but one subject, which shall be expressed in its title. If a statute embraces a subject not expressed in its title, only the part not expressed is void. A statute may not be amended by reference to its title. A section of a statute may not be amended unless the section is re-enacted as amended." Petitioners do not argue section 97.03 addresses more than one subject. Rather, they argue because both section 97.03 and Government Code section 56842 were amended within the same chaptered legislation, they must be read as in pari materia or run afoul of article IV, section 9.

Petitioners cite *Harbor* v. *Deukmejian* (1987) 43 Cal.3d 1078 [240 Cal.Rptr. 569, 742 P.2d 1290], which held ". . . a measure complies with the [single subject] rule if its provisions are

"When a statute is ambiguous, the intent of the Legislature may be ascertained from other statutes dealing with the same subject matter. [Citation.] Related statutes are commonly referred to as statutes in pari materia. [Citation.]" (*Carlton Browne & Co.* v. *Superior Court* (1989) 210 Cal.App.3d 35, 43 [258 Cal.Rptr. 118].) "However, . . . resort to . . . statutes *in pari materia* [] in the construction of a statute is appropriate *only where the statute, taken alone, is ambiguous or unclear.*" (*Guelfi* v. *Marin County Employees' Retirement Assn.*, *supra*, 145 Cal.App.3d at p. 307, second italics added.)

Attempting to meet this requirement, petitioners resurrect a previous argument, contending the failure to define "total annual revenues" renders section 97.03, subdivision (c), ambiguous. However, we have already rejected this contention, instead concluding the statutory language of this section is clear and unambiguous. Thus, we have no basis for referring to other statutes.

## VIII

### Annual Tax Increment

 In a convoluted argument, petitioners assert the reallocation of 1992-1993 revenues pursuant to section 97.03 should not include any portion of the "annual tax increment" because no specific authorization exists for shifting such amounts to each county's Educational Revenue Augmentation Fund.

The "annual tax increment" is the difference between the total amount of property tax revenue and the amount of property tax revenue allocated to the jurisdiction in the prior fiscal year. (§§ 97, subds. (a), (c), 98.) Thus, the annual tax increment reflects the growth from the previous year's revenues.

In computing the reallocation of property tax revenues pursuant to section 97.03, county auditors may elect to make their calculations either on a countywide basis or by tax rate areas. (§ 97.04.) In permitting this election, section 97.04 provides if the county auditor elects to use a countywide basis, "he or she shall ensure adequate recognition of year-to-year revenue growth so that the results of changes implemented on a countywide basis do not

---

either functionally related to one another or are reasonably germane to one another or the objects of the enactment." (*Id.* at p. 1100; see also *League of Women Voters* v. *Eu* (1992) 7 Cal.App.4th 649, 659 [9 Cal.Rptr.2d 416].) The fact two sections are "reasonably germane to one another" does not require an in pari materia reading absent any ambiguity. (See *Guelfi* v. *Marin County Employees' Retirement Assn.* (1983) 145 Cal.App.3d 297, 307 [193 Cal.Rptr. 343].) Petitioners' argument is unpersuasive.

differ materially from the results which would be obtained from the use of a tax rate area basis." Despite the mention of "year-to-year revenue growth," petitioners argue section 97.04 does not specifically authorize any allocation of the annual tax increment to Educational Revenue Augmentation Funds. Petitioners further contend allocations of the annual tax increment are controlled by sections 97 and 98, which restrict allocations to "jurisdictions." Thus, according to petitioners, the districts "are entitled to a full distribution of the 1992-1993 annual tax increment." We disagree.

Section 97, which addresses calculations by tax rate area, states the annual tax increment "shall be allocated pursuant to Section 98." Section 98, which sets forth the formula for determining the annual tax increment, states at subdivision (i): "For purposes of the calculations made pursuant to this section for the 1993-94 and 1998-99 fiscal years, the amount of property tax revenue allocated to the county, a city, a special district, a school district, community college district, *or an Educational Revenue Augmentation Fund* in the prior fiscal year shall be that amount as determined pursuant to Section 97, as modified or as provided in Section 97.01 or 97.03." (Italics added.) Petitioners construe this provision as permitting an allocation of the annual tax increment to Educational Revenue Augmentation Funds only in fiscal years 1993-1994 and 1998-1999. However, the language of the statute is otherwise. The statute refers to "the amount of property tax revenue allocated to . . . an Educational Revenue Augmentation Fund *in the prior fiscal year* . . . ." (Italics added.) The fiscal year preceding 1993-1994 is 1992-1993—the first year of allocations to Educational Revenue Augmentation Funds pursuant to section 97.03. To read the statute as petitioners suggest and ignore the reference to "the prior fiscal year" would render this language superfluous.[19] Petitioners' argument lacks merit.

IX

*Offset*

Petitioners contend they are entitled to an offset of the amounts owed to the districts by the state against the section 97.03 reallocations.

---

[19]Petitioners also contend annual tax increments may only be allocated to "jurisdictions"—a term which petitioners contend does not encompass the Educational Revenue Augmentation Funds. Section 95, subdivision (b), includes cities, counties, special districts, school districts, community college districts, and county superintendents of schools within the definition of "jurisdiction." The beneficiaries of the Educational Revenue Augmentation Funds are school districts, county offices of education, and community college districts. (§ 97.03, subd. (d)(1).) Annual tax increments are initially allocated to the special districts, which are specifically included within the "jurisdiction" definition, and a percentage is then subsequently reallocated by the county auditors to the Educational Revenue Augmentation Funds for the benefit of the school districts. We find no statutory prohibition to this procedure.

Petitioners seek to offset the amounts of claims submitted to the State "for reimbursement of State-mandated costs including the cost of structural (Tit. 8, Cal. Code Reg., §§ 3401-3409) and wildland (Tit. 8, Cal. Code Reg., § 3410) fire protection clothing and equipment and/or personal alarm devices [tit. 8, Cal. Code Reg., § 3410, subd. (c)]."

 "The right to offset is a long-established principle of equity. Either party to a transaction involving mutual debits and credits can strike a balance, holding himself owing or entitled only to the net difference. [Citation.]" (*Carmel Valley Fire Protection Dist.* v. *State of California, supra*, 190 Cal.App.3d at p. 550.) The courts have permitted offset by local agencies against the state, but under circumstances very different from those presented here. (*Ibid.*)

*Carmel Valley* also concerned reimbursement for protective clothing and equipment for firefighters. The state mandate issues were fully litigated before the State Board of Control, which concluded the state should reimburse the county. (190 Cal.App.3d at pp. 531, 535.) When the county did not receive reimbursement, it filed a petition for writ of mandate. The court granted a peremptory writ and permitted the county to offset its claims against fines and forfeitures due to the state. (*Id.* at p. 550.)

Contrary to the circumstances presented in the cases cited by petitioners, the districts' claims for reimbursement have not been adjudicated. Accordingly, we find the trial court's comments on this point quite appropriate: "[W]hat you want me to do . . . it seems to me, is to interject via the concept of offset the judiciary into an ongoing rather regular process for securing reimbursements for state mandated costs. . . . [¶] [Y]ou've never had the determination by the Controller that he isn't going to pay you."

The amounts sought by the districts as offsets were submitted to the state as claims for payment pursuant to Government Code section 17561. Government Code section 17552 states, "[t]his chapter shall provide the sole and exclusive procedure by which a local agency . . . may claim reimbursement for costs mandated by the state . . . ." Government Code former sections 17620-17626 set forth procedures for offsetting local savings against state reimbursements. However, the Legislature repealed these sections in 1993. The repeal of these sections would appear to indicate the Legislature intended to eliminate offset as a remedy available to reimbursement claims for state-mandated costs.

We find no statutory or case law authority for permitting the districts to offset these unaudited, pending claims for reimbursement.

## X

### *Additional Exclusions and Calculations*

Petitioners' remaining contentions concern certain specific items—prior year carryovers, special taxes and fire benefit assessments, mitigation fees, reimbursements, cost recoveries, refunds, debt service, interest, and one-time revenues—which petitioners assert "should be excluded" from the determination of total annual revenues. Petitioners also ask us to apply these exclusions to the specific circumstances of each district and recalculate each district's total annual revenue.

At the time petitioners instituted this action, section 97.03 restricted the reallocation of property tax revenues to no more than "10 percent of that district's total annual revenues, from whatever source, as shown in the 1989-90 edition of the State Controller's Report on Financial Transactions Concerning Special Districts," subject to the specific exclusions set forth in sections 97.03 and 97.06. Petitioners' argument seeks to insert additional terms into the statute to reduce the revenues subject to the 35 percent reduction. However, "[w]ords may not be inserted in a statute under the guise of interpretation." (*In re Miller* (1947) 31 Cal.2d 191, 199 [187 P.2d 722].) A statute " '. . . is to be interpreted by the language in which it is written, and courts are no more at liberty to add provisions to what is therein declared in definite language than they are to disregard any of its express provisions.' [Citation.]" (*Wells Fargo Bank* v. *Superior Court* (1991) 53 Cal.3d 1082, 1097 [282 Cal.Rptr. 841, 811 P.2d 1025]; see also Code Civ. Proc., § 1858 ["[i]n the construction of a statute . . . , the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted . . . ."].) We are not at liberty to rewrite the statute.

With regard to petitioners' request to recalculate their total annual revenues, we note during the pendency of this appeal the Legislature amended section 97.03, adding clarification and some additional exemptions from the calculation of "total annual revenues." (§ 97.03, subd. (c)(2), (4), (6).) In particular, the amendments exclude "one-time revenues received by the district from any source, public or private" from the determination of total annual revenues, which is one of the items petitioners challenged. (§ 97.03, subd. (c)(4)(A).) These amendments are retroactive, requiring the county auditors to adjust the 1992-1993 calculations to reflect these changes. (Stats. 1993, ch. 1279, § 2.)

"The requirement of ripeness prevents courts from issuing purely advisory opinions. '[T]he ripeness doctrine is primarily bottomed on the recognition

that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy.' " (*Selinger* v. *City Council, supra,* 216 Cal.App.3d at p. 272.) Until the county auditors have completed their 1993-1994 calculations and responded to petitioners' proposed adjustments, if any, there is no issue ripe for judicial resolution. We will not render an advisory opinion as to how the county auditors should compute these reallocations.[20]

## DISPOSITION

The judgment (order) is affirmed.

Davis, Acting P. J., and Raye, J., concurred.

A petition for a rehearing was denied June 20, 1994, and appellants' petition for review by the Supreme Court was denied August 25, 1994.

---

[20]Petitioners concede the Legislature's October 1993 amendments to section 97.03 requires the county auditors to recalculate the property tax revenues subject to reallocation for the 1992-1993 fiscal year due to various exclusions from the calculation of total annual revenues. However, petitioners contend we should remand this matter to the trial court "for confirmation of these now-required calculations." We disagree. There is no assertion the county auditor-controllers are refusing to make the recalculations ordered by this statute. Until these recalculations are complete, petitioners can point to no dispute with the county on this matter. Accordingly, a remand is premature.

We additionally deny petitioners' application for appellate court to take additional evidence and request for judicial notice. Petitioners' proffered evidence relates to calculations pursuant to the statute, and as we have noted, this subject is not ripe for our review.